UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| SERIFOS MARITIME CORPORATION and ANDROS MARITIME AGENCIES LTD | : : : : | |
| Plaintiffs, | : : | |
| - against - | : : | 22-CV-8012 (LGS) |
| GLENCORE SINGAPORE PTE LTD, | : : : | December 23, 2022 |
| Defendants. | : : : | |

### AMENDED VERIFIED COMPLAINT

Plaintiffs, Serifos Maritime Corporation ("Serifos") and Andros Maritime Agencies Ltd. ("Andros")(collectively "Plaintiffs"), by their attorneys, Tisdale & Nast Law Offices, LLC, allege, upon information and belief, the following:

### THE PARTIES

1. Plaintiff, Serifos, is an entity organized and existing under the laws of Liberia with an office at 80 Broad Street, Monrovia, Liberia.

2. At all material times, Serifos was the registered Owner of the M/T SERIFOS, a very large crude oil carrier ("Vessel" or "SERIFOS").

3. Plaintiff Andros is an entity organized under foreign law with a principal office and business of in London, England.

4. At all material times, Andros was the London agent for the technical and commercial manager of the Vessel.

1

5. Defendant Glencore Singapore Pte Ltd, ("Glencore" or "Defendant") is an entity organized under the laws of a foreign country with an office located at 1 Temasek Ave, Singapore 039192 and was at all material times, a supplier of fuel to ocean going vessels.

6. The Defendant's parent Glencore LTD, is a corporation organized under the laws of Switzerland with a place of business at 330 Madison Ave., New York, NY 10017.

## JURISDICTION

7. This is an action arising out of the sale, supply, and delivery of marine bunker fuel by Glencore into the market and to Plaintiffs, the ultimate purchasers and users of that marine fuel for the Vessel.

8. This matter falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333 as Plaintiffs assert claims for breach of maritime contract and maritime tort claims, including claims of gross negligence, arising from the sale and supply of defective and dangerous marine fuel into the market for consumption by ocean-going vessels, and specifically to Plaintiffs for consumption by the Vessel. This matter also falls within the scope of Rule 9(h) of the Federal Rules of Civil Procedure.

9. Venue is proper because Defendant's General Terms and Conditions for the Sale of Marine Fuel ("GTC") call for exclusive jurisdiction in the United States District Court for the Southern District of New York.

## FACTS COMMON TO ALL COUNTS

10. "Bunker fuel" or "bunkers" is the name given to the fuel which powers most ocean-going vessels. It is comprised of the residual product from the refining of oil during which lighter hydrocarbons are extracted. In order to be consumable aboard ships, the residual product can be

mixed to varying degrees with lighter fuels or "cutter stock" so that the end product meets the Vessel's specifications.

SERIFOS stem

11. On or before March 10, 2022, Plaintiffs, through the services of a bunker broker, Socomet Bunkering, ordered 4,110 mts of 380 3.5% max sulphur bunker fuel to be supplied to the M/T SERIFOS ("stemmed") in Singapore.

12. On March 10, 2022, Socomet issued a Bunker Confirmation Note confirming the details of the upcoming stem including the fact that the stem would conform to the agreed standards established by the International Standards Organization ("ISO"), namely ISO 8217:2017, and the International Convention for the Prevention of Pollution from Ships ("MARPOL") MARPOL Annex VI.  The Bunker Confirmation also provided that "THE FUEL SHOULD BE…FREE FROM SPENT LUBRICANTS AND ANY OTHER WASTE AND HARMFUL PRODUCTS." Glencore confirmed the terms were acceptable in an email received that same day.  Based upon these representations by Glencore, loading of the bunkers commenced the following day.

13. During the stem, drip samples were collected and distributed to the parties. Plaintiffs, as a reasonably prudent ship owner, sent a sample to be tested to establish that the bunkers satisfied the general parameters of the ISO 8217:2017 specifications.  As Glencore was aware, usually by the time the test results would be received, the stemmed vessel would be well on its way to its destination (here, Cap Lopez, Gabon, many miles from Singapore), with only a small quantity of previously loaded and tested bunkers on board.

14. Once the stem was completed, Glencore issued a Bunker Delivery Note ("BDN") confirming the quantity loaded and again confirming that the bunkers satisfy MARPOL Annex VI.

15. Annex B of ISO 8217:2017 requires that a fuel supplier, like Glencore "have in place adequate assurances and management procedures to ensure that the resultant fuel is compliant with the requirements of Clause 5." Clause 5 of ISO 8217:2017 contains the general requirement that the fuel is "*free from any material at a concentration that causes the fuel to be unacceptable for use*". MARPOL Annex VI Regulation 18 specifically requires that the fuel supplied to ships must be free from inorganic acids or chemical waste that could jeopardize the ship.

Glencore's prior extensive contamination experience

16. In 2018, the maritime industry experienced a rash of bunker contamination claims arising out of the use of cutter stocks containing components which were not naturally found in petroleum products, and which were harmful to the ships on which they were loaded. Such bunkers could, and did, cause significant damage to vessels' engines, sometimes to a point of causing a complete engine breakdown necessitating the employment of salvors to bring the vessels safely to ports of refuge. Glencore was well acquainted with this problem. Glencore was a party to multiple lawsuits by vessel owners suffering the consequences of bunker fuel contaminated with biofuels which caused damage to engine parts and occasionally complete engine breakdown. *See, e.g., KPI Bridge Oil, Inc. v. Glencore Ltd.,* 1:19-CV-02772-ER (S.D.N.Y. Mar. 28, 2019); *ADMIntermare v. Kamca Trading SA et al.,* 1:20-CV-01223-JPO (S.D.N.Y. Feb. 12, 2020); *VL8 Pool, Inc. v. Glencore Ltd.,* 1:20-CV-02053-ALC (S.D.N.Y. Mar. 6, 2020); *Centurion Bulk Pte Ltd. v. NuStar Energy Services, Inc.,* 4:19-CV-00931 (S.D. Tex. Mar. 14, 2019); *Glencore Ltd. v. Maersk Oil Trading Panama S.A and Maersk Line A/S,* Index No. 655121/2019 (N.Y. Sup. Ct. N.Y. Cty.) (declaratory judgment action); *Kamca Trading S.A. and Sterrzengger & Co. LLC v. Glencore Ltd.,* Index No. 6551993/2022 (N.Y. Sup. Ct., N.Y. Cty.); *Kamca Trading S.A. and*

*Sterrzengger & Co. LLC v. Glencore Ltd.,* Index No. 6551840/2022 (N.Y. Sup. Ct., N.Y. Cty.); *Kamca Trading S.A. and Sterrzengger & Co. LLC v. Glencore Ltd.,* Index No. 6551089/2022 (N.Y. Sup. Ct., N.Y. Cty.); and *Kamca Trading S.A. and Sterrzengger & Co. LLC v. Glencore Ltd.,* Index No. 651279/2022 (N.Y. Sup. Ct., N.Y. Cty.).

17. Glencore was intimately familiar with the 2018 contaminated bunker dilemma because, according to its Complaint against Freepoint Commodities LLC, it too was the victim of the impermissible use of harmful chemicals and waste product as cutter stock. In its Complaint in *Glencore Ltd. v. Freepoint Commodities LLC*, No. 653431/2019 (N.Y. Sup. Ct., N.Y. Cty.), Glencore alleged that Freepoint sourced stock from chemical manufacturers and other non-petroleum industrial sources, which contained high levels of chemical components and other harmful substances that are impermissible in bunker fuel. Glencore has alleged that Freepoint should have performed gas chromatography-mass spectrometry ("GC-MS") and Fourier transform infrared spectroscopy ("FTIR") tests to determine the presence of these unacceptable components, and that Freepoint's failure to do so constituted negligence, violated Freepoint's duty to warn and/or represented a design defect thereby supporting strict product liability causes of action. The cost of these tests range between $750 and $1,000.

Analysis of SERIFOS samples

18. On March 20, 2022, Plaintiffs received a copy of the laboratory analysis of the drip sample. While it showed that the sample satisfied the simple specification of ISO 8217:2017, the laboratory also performed GCMS Headspace Chemical Screening and detected "elevated levels of chloro-contaminates," i.e., chlorinated hydrocarbons (also referred to as "organic chlorides").

19. Thereafter, further analysis was performed, including GCMS of the vessel sample drawn during the stem. The analysis was performed by a certified laboratory experienced in the

testing of bunker fuel.  The tests established that the bunkers were, in fact, contaminated with 12 different organic chlorides at a total concentration of 4,450 mg/kg (0,45% mass.).

20. In particular, the analysis showed the presence of dichloroethane, a manufactured chemical not found naturally in the environment, commonly used in plastic and vinyl products, or as a solvent. The samples also include trichloromethane, another chemical not found in the environment, generally used as a cleaning solvent. Tetrachloroethylene, another not-naturally-occurring chemical used in dry cleaning and metal degreasing was found as well. These chlorinated compounds, and others also reported to be present in the stem, do not originate naturally in the petroleum feedstocks allowable under ISO 8217:2017.

21. Fuels containing organic chlorides are harmful and dangerous to a vessel, its machinery and crew and the environment, as they pose a serious risk of causing mechanical failure in the main and auxiliary engines.  Organic chloride components can decompose during heating of the fuel and, in the presence of water (residual fuel oils are always expected to contain some water, even at trace levels), can form hydrochloric acid, a strong, corrosive inorganic acid.  It is a requirement of ISO 8217:2017 that bunkers not contain material that can be damaging to the ship's equipment, jeopardize the safety of the ship or be harmful to personnel.  Similarly, MARPOL Regulation 18 specifically requires that the fuel supplied to ships must be free from inorganic acids or chemical waste which could jeopardize the ship.

22. Furthermore, ISO 8217:2017 Clause 6.6 (and Clause 5 in earlier versions of ISO 8217) requires that bunker fuels be free from inorganic acid.  The heating of the fuel containing organic chloride components prior to injection into the engine could lead to the formation of inorganic acid, which would contravene ISO 8217:2017 Clause 6.6.  Additionally, the combustion of fuel containing organic chlorides would form hydrochloric acid within the engine combustion

chamber, which could potentially lead to engine damage due to lubricant film breakdown and, for ships with scrubbers,[1] strong acids in the engine's exhaust gases could cause corrosion in the scrubber systems.  Finally, organic chloride components have a solvency effect, such that settled sludge could potentially be 'dislodged' and drawn into the ship's fuel system and engine, causing serious damage.

23. Bunker fuels containing organic chlorides are considered off specification against ISO 8217:2017 and MARPOL Annex VI.

24. ISO 8217:2017 requires that Glencore, as a bunker supplier, have quality assurance and management of change procedures in place to ensure that the bunkers it intends to sell to ocean going vessels are compliant with all requirements of ISO 8217:2017.  Based in part on its prior knowledge from the 2018 dilemma, Glencore, as a bunker fuel oil producer, knew it must ensure that the bunkers conform with the specifications, which may include GCMS and FTIR testing, and also knew well the potential life-threatening hazards which non-compliant bunkers can pose to an ocean-going vessel. If a manufacturer of bunker fuel becomes aware of indicators that the products used as blends in the bunkers may contain impermissible components that are not produced in petroleum refining, it is incumbent on the manufacturer to determine the nature, source and concentration of the chemicals in the component product.

State of Glencore's knowledge

25. Further, Glencore was aware and/or knew from complaints from other vessels stemmed before the SERIFOS of the presence of these contaminants.   According to industry sources, the presence of organic chlorides in Glencore's bunkers began as early as February, 2022. In the normal course of events, even if Glencore had not performed GCMS tests which would have

---

[1] Scrubbers are exhaust gas cleaning systems which remove harmful elements from exhaust gases.

disclosed the presence of these harmful contaminants, Glencore was aware from the vessels it stemmed earlier with the contaminated bunkers that these bunkers were hazardous, yet it took no action either to rectify the problem before stemming the SERIFOS, or to discontinue the sale of the hazardous bunker fuel, or even advise the customers like Plaintiffs, of the potential that the bunkers were hazardous. Numerous bunker fuel testing laboratories issued advisory notices about the presence of dangerously high levels of organic chlorides in the fuel Glencore was providing. One such laboratory, Viswa Lab, alerted the industry on March 1, 2022 that it had already identified three ships whose bunkers they analyzed and found contaminated with organic chlorides. Despite this knowledge, Glencore took no action to rectify the problem with the vessels it had stemmed. Glencore failed to advise the previously stemmed vessels of the significant risks those ships faced if the contaminated fuel was consumed. Instead, Glencore continued to sell the contaminated fuel despite knowing it was contaminated, failing to discontinue the sale of the hazardous bunker fuel. In fact, in the course of the stems which occurred after March 1, 2022, Glencore intentionally misrepresented to Plaintiffs and others that the bunkers would comply with ISO 8217:2017 and MARPOL. Upon information and belief, as noted herein, Glencore was also aware from reports of significant sediment problems being encountered by vessels it stemmed, presaging them that contamination was likely. In fact, Glencore intentionally misrepresented to Plaintiffs that the bunkers would comply with ISO 8217:2017 and MARPOL. Upon information and belief, as noted herein, Glencore was also aware from reports of significant sediment problems being encountered by vessels it stemmed, that contamination was likely.

26.     The SERIFOS consumed some of the 234 mts of Glencore bunkers which were loaded in the same tank as 1618 mts previously stemmed bunkers. (This commingling was known and accepted by Glencore in the Bunker Confirmation Note.) Although this slightly diminished

the level of the organic chlorides present in the Glencore bunkers, the Vessel still encountered significant main and auxiliary engine issues requiring extraordinary effort from the ship's crew to avoid catastrophe. The Vessel was unable to consume the Glencore bunkers any further. The Vessel diverted to Cape Town, South Africa where samples of the Glencore bunkers were drawn. Glencore was invited to attend but declined. The Vessel also diverted to Pointe Noire and Port Louis to load bunkers which it could consume while on its voyage from Singapore to Gabon to load cargo and thereafter from Gabon to Paradip, India to discharge. After completing discharge, the Vessel diverted from Paradip to Singapore where Glencore removed the remaining 3,760.48 mts of bunkers and replaced them (less 62.14 mts which were short-loaded by Glencore). Had Plaintiffs not taken these actions, serious additional damage to the Vessel and its equipment would have been sustained.

27. Formal notice of claim was presented to Glencore on March 30, 2022, setting forth the details of the claim including the nature of the damages resulting from the contaminated stem. Glencore has provided no response other than to demand payment of their invoice for the contaminated bunkers totaling $2,176,419.26. Glencore's invoice was timely paid in full by Plaintiffs. Plaintiffs have satisfied all obligations on their part to be performed.

28. As a direct result of receiving contaminated and off-specification bunkers from Glencore, Plaintiffs have suffered damages in an amount to be determined, no part of which has been paid by Glencore, although duly demanded.

## COUNT ONE
### Breach of Contract Against Glencore

29. Plaintiffs incorporate the allegations made in paragraphs 1-28 as if fully stated at length herein.

30. Plaintiffs had a valid and binding contract with Glencore which required Glencore to supply bunker fuel to the SERIFOS that met the specifications which were agreed by the Parties and the applicable regulations.

31. In breach of that contract, Glencore failed to provide bunker fuel that met the requirements of the contract including those specifications required for marine bunker fuel under MARPOL Annex VI and ISO 8217:2017.  Furthermore, Glencore's gross negligence and intentional misrepresentations (see Counts Three and Four) vitiate Glencore's alleged limitations of and exonerations from liability.

32. As a result of Glencore's breach of contract, Plaintiffs have suffered damages in an amount to be determined, no part of which has been paid although duly demanded.

## COUNT TWO
### Negligence Against Glencore

33. Plaintiffs incorporate the allegations made in paragraphs 1-28 as if fully stated at length herein.

34. As the source and physical supplier of bunker fuel, Glencore had duties to (i) exercise the degree of care in its plan or design of products to avoid any unreasonable risk of harm to the vessels exposed to danger when the bunkers were used in the manner for which it was intended; and (ii) conduct reasonable investigations to identify defects in its products.

35. The design, blending and manufacturing of the bunker fuel was in Glencore's control and, as the supplier of the bunker fuel, Glencore was in the best position to know the quality of the bunkers and any dangers posed by the presence of harmful chemicals in the bunkers.

36. Glencore knew or should have known prior to stemming each of the vessels that the bunkers were unsafe, defective, and dangerous.

37. Glencore breached its duties of care in one or more of the following ways:

      a.      By failing to use and exercise reasonable care, skill and diligence in its supply of bunker fuel which resulted in the bunker fuel being unsafe, defective and dangerous;

      b.      By failing to investigate whether the components of the bunker fuel contained concentrations of chemicals which would render the fuel oil defective, dangerous or unsafe to use aboard the vessels; and

      c.      By disregarding warnings that would indicate to any reasonable supplier of bunker fuel that further investigation was necessary to determine whether the bunker fuel or its components were harmful and dangerous.

38. As a direct result of Glencore's negligence and breach of duty, the Plaintiffs suffered damages, in an amount to be determined, no part of which has been paid, although duly demanded.

**COUNT THREE**
**STRICT PRODUCTS LIABILITY**
**Failure to Warn Against Glencore**

39. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-28 above as if set forth fully herein.

40. Glencore was in the business of blending and manufacturing finished fuel products for sale.

41. As a manufacturer of fuel oil products, Glencore had a duty to warn of latent dangers resulting from foreseeable uses of its product of which it knew or should have known.

42. Glencore was aware that the components used to blend the bunker fuel contained dangerous concentrations of harmful chemicals that were likely to cause damage to the Vessel's engines.

11

43. Glencore knew or should have known that to the extent the bunker fuel contained the concentrations of chemicals that were ultimately identified in the product, such concentrations were likely to cause damage to the Vessel's engines thereby risking the safety of the Vessel, its crew, cargo and the environment.

44. Glencore failed to warn Plaintiffs and/or the Vessel of the bunkers' latent dangers.

45. As a direct, proximate and foreseeable result of Glencore's failure to warn, the bunkers stemmed by Glencore damaged the Vessel's machinery, causing the Plaintiffs to suffer damages in an amount to be determined, no part of which has been paid although duly demanded.

## COUNT FOUR
## STRICT PRODUCTS LIABILITY
### Design Defect Against Glencore

46. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 28 above as if set forth fully herein.

47. Glencore was in the business of blending and manufacturing bunker fuel for sale into the marine marketplace.

48. As a manufacturer of bunker fuel, Glencore had a duty to exercise the degree of care in its plan or design of products to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which it was intended.

49. Glencore breached this duty in that it: (i) blended components that it knew or should have known contained chemicals in concentrations sufficient to render the finished bunker fuel defective and dangerous without investigating or remediating dangers posed by the finished product; and (ii) knew or should have known of the presence of organic chlorides in its bunker fuels and notwithstanding this knowledge, failed to conduct reasonable inspections to identify defects in the components of the bunker fuel. Glencore could and should have blended the bunker

fuel using alternative components derived from petroleum manufacturing that did not contain excessive concentrations of dangerous or harmful chemicals.

50. As a direct, proximate and foreseeable result of Glencore's breaches of these duties, Plaintiffs have suffered damages in an amount to be determined, no part of which has been paid although duly demanded.

## COUNT FIVE
## Intentional Misrepresentation Against Glencore

51. Plaintiffs incorporate the allegations made in paragraphs 1-28 as if fully stated at length herein.

52. Glencore represented to Plaintiffs in its Bunker Confirmation Note and BDN, that the bunker fuel that would be delivered and that was delivered to the Vessel met the specifications agreed to between the Parties. These specifications and standards are required by international convention and regulations.

53. The crucial aspect of the transaction was Glencore agreeing to sell and Plaintiffs agreeing to buy bunker fuel which complied with the contract specifications and international standards.

54. At all material times, Glencore was aware of the potential hazards to the Vessel, its crew, owner, and the environment if the bunker fuel supplied to the Vessel did not comply with the contract specifications and international standards.

55. In the international shipping industry, time is of the essence. When vessels arrive at a port, they must either load or discharge their cargoes and obtain necessaries such as bunker fuel on a top urgent basis. Shipowners rely upon the bunker suppliers to provide bunkers which are compliant and do not threaten damage to the ship or harm to the crew or the environment.

56. Vessels, their owners, and charterers therefore rely on bunkering companies such as Glencore to supply the vessels with safe, compliant bunkers.

57. Companies such as Glencore which market themselves to ship owners and charterers as global leaders in the supply of petroleum products are intimately aware of the important role they play in the operation of ocean-going vessels in international trade and the trust which vessel owners and charterers must place in bunker suppliers like Glencore when relying on their representations regarding the bunkers.

58. Glencore knew the specifications of the bunkers before it supplied them to Plaintiffs.

59. In the delivery confirmation and messages leading up to the supply of the bunkers, Glencore represented that the fuels were compliant and safe.

60. Those repeated representations were false and, upon information and belief, the falsity of those statements was known to Glencore.

61. Plaintiffs relied on those intentional misrepresentations to their detriment, and allowed the off-spec fuel to be loaded aboard their Vessel.

62. As a result of Glencore's intentional misrepresentations, Plaintiffs have suffered damages in an amount to be determined, no part of which has been paid although duly demanded.

## COUNT SIX
### Gross Negligence Against Glencore

63. Plaintiffs incorporate the allegations made in paragraphs 1-28 as if fully stated at length herein.

64. Glencore, as the physical supplier of the bunker fuel purchased by the Plaintiffs, had a duty to provide fuel which was not defective or harmful to the Vessel's machinery.

65. In breach of that duty, Glencore delivered fuel which did not satisfy the contract specifications or industry standards, and which could not be reasonably consumed, and if consumed, could severely damage the Vessel's main and auxiliary engines, threatening the welfare of the Vessel, its crew and cargo, and the environment.

66. Despite knowing the hazards posed by potentially contaminated fuel from its 2018 experience, Glencore failed to undertake suitable quality assurance procedures, despite knowing the drastic consequences and enormous damages their failure to do so could cause.  Furthermore, upon information and belief, Glencore had received complaints from numerous other ships arising from the consumption of Glencore's bunkers.  Despite this knowledge and understanding the correlation between sediment and the presence of organic chlorides, Glencore failed to perform any further testing for these hazardous contaminates.  Further, in addition to these extreme departures from industry and Glencore's own standards, Glencore continued to supply vessels, such as the SERIFOS, despite being specifically advised of problems which, if properly considered by Glencore instead of dismissed, would result in their discovering the presence of the hazardous organic chlorides.  Glencore's gross negligence in failing to follow its own standards and exercise even a scintilla of care, knowing the drastic consequence, was compounded by its refusal to investigate the source of the operational issues caused by its defective bunkers.

67. In callous disregard of its responsibilities, Glencore made no effort to remedy or advise Plaintiffs of the non-compliant fuel and continued to supply bunker fuel to this and other vessels.

68. As a result of Glencore's grossly negligent acts and omissions, Plaintiffs have suffered damages in an amount to be determined, no part of which has been paid although duly demanded.

**WHEREFORE**, Plaintiffs pray:

A.     That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Amended Complaint, failing which default judgment be entered against it in an amount to be determined.

B.     That this Court award Plaintiffs the attorneys' fees and costs incurred in this action; and

C.     That the Plaintiffs have such other, further and different relief as the Court deems just, proper and equitable.

Dated: December 23, 2022
       New York, NY

                        Respectfully submitted,
                        Attorneys for Plaintiffs,

By:     /s/ Thomas L. Tisdale
         Thomas L. Tisdale (TT5263)
         Timothy J. Nast (TN8578)
         Tisdale & Nast Law Offices, LLC
         Chrysler Building
         405 Lexington Ave., 26th Floor
         New York, NY  10174
         Tel:   212-354-0025
         *ttisdale@tisdale-law.com*
         *tnast@tisdale-law.com*

## ATTORNEY'S VERIFICATION

Thomas L. Tisdale, an attorney duly authorized to practice before this Honorable Court, under the penalty of perjury of the laws of the United States, declares as follows:

1. My name is Thomas L. Tisdale.

2. I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3. I am an attorney at Tisdale & Nast Law Offices, LLC, attorneys for the Plaintiffs.

4. I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5. The reason why this Verification is being made by the deponent and not by the Plaintiffs is that the Plaintiffs are business organizations with no officers or directors now within this District.

6. The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiffs and agents and/or representatives of the Plaintiffs.

7. I am authorized to make this Verification on behalf of the Plaintiffs.

8. The foregoing is true and correct under penalty of perjury of the laws of the United States of America.

Dated: December 23, 2022
Southport, CT

_____
Thomas L. Tisdale